# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. 06-00081-TLM |
| JAN L. THORIEN & | ) | |
| MARK E. THORIEN, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| JAN L. THORIEN & | ) | |
| MARK E. THORIEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 06-06019-TLM |
| | ) | |
| BARO ENTERPRISES, LLC; | ) | |
| WASHINGTON MUTUAL BANK; | ) | |
| FIRST AMERICAN TITLE CO.; | ) | |
| U.S. BANK NATIONAL ASSOC. | ) | |
| DBA U.S. BANK; KEY BANK, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

**INTRODUCTION**

    Jan and Mark Thorien ("Debtors" or "Plaintiffs") filed a chapter 11

MEMORANDUM OF DECISION - 1

bankruptcy petition on February 8, 2006.[1]  Prior to bankruptcy, Debtors defaulted

on their home mortgage with the holder of a first priority deed of trust,

Washington Mutual Bank ("WaMu").  WaMu proceeded to foreclose on its

interest, and Debtors' residence (the "Property")[2] was sold to BARO Enterprises,

LLC ("BARO") in September, 2005.

Debtors filed this adversary proceeding alleging numerous causes of action

based on WaMu's foreclosure and the sale of the Property to BARO.  The Court

disposed of several causes of action on summary judgment.[3]  Trial was held on the

remaining causes on August 20, 21, 25 and 27, 2008.  The issues tried were

Plaintiffs' counts five (breach of contract), six (breach of the covenant of good

faith and fair dealing), and seven (fraud), and BARO's counterclaim for

possession and damages for Debtors' wrongful occupation of the Property.[4]  Also

---

[1]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005), became effective October 17, 2005, and applies to this case.  The Court takes judicial notice of its files in the chapter 11, Case No. 06-00081-TLM.  Fed. R. Evid. 201.  Pleadings in that case are identified by "Doc. No." and pleadings in this adversary proceeding are identified by "Adv. Doc. No.".

[2]  Lot 4 of Block 3, Warm Springs Terrace, per plat filed in Book 13 of Plats at p. 799, Records of Ada County, Idaho (1923 Bob's Drive, Boise, ID).

[3]  *In re Thorian*, 387 B.R. 50, 08.2 I.B.C.R. 41 (Bankr. D. Idaho 2008).  The Court notes Debtors' name is misspelled in this published decision.

[4]  The issues tried involved only the Debtors, WaMu and BARO.  Defendants US Bank and Key Bank are junior lien holders and made no appearance at trial.  Defendant First American Title Company ("FATCO"), the trustee under the terms of the deed of trust foreclosed upon by WaMu, was dismissed from the adversary proceeding by stipulation.  *See* Adv. Doc. Nos. 51, 56. At trial, after Plaintiffs rested, BARO moved under Fed. R. Civ. P. 41, incorporated by Fed. R.

(continued...)

MEMORANDUM OF DECISION - 2

pending at the time of trial was BARO's motion for stay relief in Case No. 06-00081-TLM.  Having carefully considered the evidence presented[5] and the parties' legal arguments, the following constitute the Court's findings and conclusions. Fed. R. Bankr. P. 7052.[6]

## BACKGROUND AND FACTS

### A.    Debtors

Mark and Jan are married.  Mark is educated and intelligent, holds a 1974 bachelor's degree in business, and has completed courses in a Master of Business Administration program.  Mark owns his own business, Thor Construction, Inc., which is involved in the remodeling of residential real properties.  He testified that as a business owner, he has entered several contracts and is generally familiar with contractual obligations.  Prior to becoming a contractor, Mark held positions in sales and operations with various businesses.  At home, he is responsible for making the mortgage payment for the Property.

In December 1998, Debtors executed a $172,270.00 note with Homeside

---

[4](...continued)
Bankr. P. 7041, to dismiss counts five, six and seven against it.  The motion was granted without objection.

[5]  The Court's findings that are based on testimony include the Court's evaluation of the credibility of the witness and the weight to be given the testimony, even if those considerations are not highlighted in the text of the Decision.

[6]  The parties have not contested jurisdiction, 28 U.S.C. § 1334(a), (b), nor venue, 28 U.S.C. § 1409(a), nor the ability of this Court to enter judgment, 28 U.S.C. § 157(b), (c).  *See also* Fed. R. Bankr. P. 7008(a).

MEMORANDUM OF DECISION - 3

Lending, Inc. secured by a deed of trust on the Property.  WaMu later became the

beneficiary under the deed of trust.

      **B.**      **The First Forbearance Plan**

Debtors defaulted on their mortgage, and on December 5, 2003, a Notice of

Default was filed in Ada County for their failure to make the required monthly

payments from August 2003 through November 2003.  Ex. 236.

In April 2004, Debtors began working with Leslie Quarterman[7] of WaMu's

loss mitigation department.  Later that year, in August 2004, Ms. Quarterman

discussed with Mark a twelve-month repayment agreement (the "First Forbearance

Plan").  The plan required an initial payment of $6,000.00 by September 14, 2004,

followed by twelve monthly payments of $2,624.78 beginning on October 1,

2004.  Ex. 208.  During cross-examination by WaMu, Mark identified the specific

financial information he was required to provide in order to activate the plan.[8]

Debtors did not timely make the initial payment and on October 15, 2004,

WaMu sent Debtors a letter terminating their loan workout based on their failure

---

[7] Ms. Quarterman worked as a specialist in WaMu's loss mitigation department from 2003-2005 before becoming a trainer for the department.  She was certified by Freddie Mac to negotiate workouts with borrowers in default and was WaMu's most experienced loss mitigation specialist for Freddie Mac loans.

[8] This included (1) Debtors' April 21, 2004 financial worksheet; (2) a personal bank statement for the period April 9, 2004 through May 10, 2004; (3) a declaration of current homeowner's insurance; (4) real property taxes due as of June 9, 2004; (5) an income statement for the Mark Thorien Company for the period June 1, 2004 through December 31, 2004; and (6) Jan's payroll statement for the period ending June 15, 2004.  The documents were offered and admitted without objection.  *See* Ex. 247.

MEMORANDUM OF DECISION - 4

to pay the $6,000.00.  Ex. 105.  However, on November 3, 2004, Debtors paid by certified check $8,624.78, and the plan was reactivated.[9]  Exs. 206, 211.

On December 7, 2004, Debtors initiated an electronic "just-in-time" ("JIT") payment for $2,886.28.  Ex. 207.  Mark testified that Patrick McGroarty, a WaMu employee, told him that payment of this amount would bring the plan current.[10]

Debtors then attempted to pay $1,437.15 – the "regular" amount of their monthly mortgage payment – by a check dated December 30, 2004.  Mark testified that he intended this check to be the "January 2005" payment under the First Forbearance Plan, even though it was not the $2,624.78 amount required by that Plan.  He paid this amount based on the prior conversation with Mr. McGroarty, and also in light of an Annual Escrow Account Statement he received from WaMu in December 2004.  *See* Ex. 243.[11]  The check was returned to

_____

[9]  This amount represented the $6,000.00 initial payment and the $2,624.78 October 2004 payment.  Ms. Quarterman testified that she accepted the late payments since she had worked hard with Debtors and "really wanted them to cure."

[10]  Mark admitted on cross-examination it did not make sense for him to pay only $2,886.28.  At that time, Debtors were delinquent in their November and December forbearance plan payments, each for $2,624.78.

[11]  The statement contains an "Escrow Account Balancer/Shortage Payment Coupon" for a total escrow shortage of $5,261.41 as of December 7, 2004.  It explained Debtors' options to pay the entire escrow shortage either by January 6, 2005, or over twelve months.  There are three columns listing different monthly home loan payment amounts.  The first is Debtors' former "current" monthly payment of $1,437.15.  The other two show the "new payment" required depending on which option is chosen to pay the escrow shortage.  In attempting to pay $1,437.15, Debtors ignored the escrow shortage and the statement's explanation.

MEMORANDUM OF DECISION - 5

Debtors with a letter stating the payment was "insufficient to reinstate." Ex. 106.[12]

On January 6, 2005, WaMu terminated the First Forbearance Plan based on Debtors' failure pay the December 2004 payment. Ex. 212. That month, Ms. Quarterman left two messages requesting that Mark call her back to discuss a workout. Ex. 207. She testified that Mark never returned these calls.[13]

Foreclosure efforts on the deed of trust were again initiated. On January 27, 2005, a Notice of Default was recorded in Ada County, stating that Debtors were delinquent on their payments from April through December 2004. Ex. 125. The trustee's sale was set and noticed for June 9, 2005.

Ms. Quarterman again attempted to help Debtors avoid foreclosure. On March 4, 2005, she left another message for Mark to call her. Ex. 206. She also sent Debtors a letter requesting the two most recent paystubs for each mortgagor. Ex. 107.[14] Ms. Quarterman testified she was not required to send this letter but

---

[12] The letter was sent by WaMu's default cashiering section, the department to which Debtors were directed to send payments under the First Forbearance Plan. The evidence suggests that the phrase "insufficient to reinstate" may not have been precise, and that the payment was returned because it was not $2,624.78 required by the plan.

[13] Ms. Quarterman testified that, had Mark returned those calls, notations thereof would have appeared in WaMu's records. She explained that all loan activity is documented in WaMu's Consolidated Notes Log. *See, e.g.* Ex. 207. A subset of that loan activity, *i.e.*, that conducted solely by loss mitigation personnel, is also captured in WaMu's LMT Process Notes. *See, e.g.,* Ex. 206. A maxim in the loss mitigation department was "if it isn't documented, it didn't happen." This was meant less as a literal observation than as an aphorism designed to encourage completeness of record-keeping.

[14] This letter states: "If we do not receive the requested documents **WITHIN 10 BUSINESS DAYS**, we will assume you do not wish to take advantage of our Homeowner's Assistance Program or, that you have made other arrangements to bring your account current. At

(continued...)

MEMORANDUM OF DECISION - 6

took the extra step based on her commitment to the Debtors' case. In the system notes, she indicated this was her final attempt to contact Mark. Ex. 207.

Ms. Quarterman testified she received no response from Debtors. On May 20, 2005, she sent Debtors a letter denying a workout for their non-compliance, inability to be reached by phone, and failure to provide the requested information. Ex. 108.

## C.    The Special Forbearance Plan

On June 3, 2005, Mark called Ms. Quarterman regarding the denial letter. In that conversation, the trustee's sale scheduled for June 9, 2005 was discussed. However, after Ms. Quarterman and Mark agreed to a ninety-day Special Forbearance Plan (the "SFP"), Ms. Quarterman indicated that the sale would not occur. Mark testified that Ms. Quarterman said the sale would be "stopped." Ms. Quarterman, however, testified that she told him it would be "postponed." It is undisputed that during the term of the SFP, the June 9, 2005 sale was serially rescheduled to July 7, 2005, August 4, 2005, September 1, 2005, and September 29, 2005. Ex. 120.

Ms. Quarterman testified that in her June 3, 2005 conversation with Mark, she explained that the SFP entailed a temporary forbearance period followed by a possible permanent loan modification. Further, she testified that in explaining this

---

[14](...continued)
that time normal servicing will resume, including foreclosure if applicable." Ex. 107.

MEMORANDUM OF DECISION - 7

"process" under the SFP, she told Mark she would not need his financial

information for a possible modification until August 2005.

Later that day, Ms. Quarterman faxed the SFP to Mark. Exs. 110-111. The

SFP required payments of: (1) $2,000.00 by June 6, 2005; (2) $1,500.00 by July 6,

2005; and (3) $1,500.00 by August 6, 2005. Ex. 111. It states:

> **During this period, you will not be required to make your regular
> monthly payment. The plan allows you 90 days to prepare for a
> loan modification**. . . . <u>**Funds must be in the form of a Cashier's
> Check OR Money Order ONLY**</u>. . . . Failure to make the agreed-upon
> payments when due will result in a default. . . . If you fail to pay any
> payment as promised, this agreement will be canceled, and normal
> servicing and/or foreclosure proceedings will be initiated.

*Id*. Attached to the fax was a financial statement Debtors were asked to complete

"prior to the EXPIRATION of the forbearance agreement" so Ms. Quarterman

could determine whether they qualified for a loan modification. Ex. 110. On the

fax cover sheet, Ms. Quarterman asked Debtors to include a letter explaining the

reason for the default and to return the documents "no later than 8/15/05." *Id*.

Notwithstanding the "process" which Ms. Quarterman testified she

explained to Mark, and her instruction to him that she did not need his financial

information until August 2005, Mark responded only days later. On June 7, 2005,

Mark faxed Ms. Quarterman a letter, a financial statement dated June 6, 2005, and

Jan's paystub for the period ending December 31, 2004. Exs. 112, 114-16.[15]

---

[15] The fax cover states: "I only have a yearly summary on the income. The pay is
(continued...)

Ms. Quarterman testified that on August 10, 2005, she mailed Debtors a letter requesting another financial statement, the most recent paystubs for both homeowners, and a letter explaining the reason for their delinquency. *See* Ex. 117 (the "Missing Items Letter").[16] Though the letter was properly addressed, Mark testified Debtors never received it. He admitted, however, to receiving Ms. Quarterman's prior written correspondence similarly addressed.[17]

Although Ms. Quarterman then started her new position as a loss mitigation trainer, and Debtors' case was reassigned to WaMu employee Emily Swenke, she continued to work on the case. On August 23, 2005, Ms. Quarterman copied and resent the Missing Items Letter to Debtors. Exs. 117, 119. Mark testified that he

---

[15](...continued)
automatically put into our account without any paperwork, but nothing has changed for this year." Ex. 112. Also on this date, Mark attempted to make an electronic JIT payment for $2,000.00. WaMu would not accept a JIT payment during the forbearance period, and Debtors therefore sent the payment by overnight mail. Ex. 118.

[16] The Missing Items Letter states:

Upon receipt of this information, we will continue evaluating your request for assistance. . . . If we do not receive the requested documents, we will assume you do not wish to take advantage of our Loss Mitigation Program, or that you have made other arrangements to bring your account current. . . . Please understand that during the review period, normal default procedures (including foreclosure and collection activity as necessary) will continue. Therefore, it is imperative that you respond as soon as possible. This letter is not an approval by Washington Mutual of your requested loan workout plan.

Ex. 117.

[17] As noted, Mark received the similarly addressed May 20, 2005 denial letter, and he admitted to receiving a September 27, 2005 denial letter, discussed *infra*, also similarly addressed.

MEMORANDUM OF DECISION - 9

never received the copy.

On August 30 and September 15, 2005, Ms. Swenke left voice messages with Debtors to call her to discuss the workout. Ex. 207. Mark testified he did not receive these messages. WaMu proceeded with foreclosure, which would culminate in the trustee's sale that had been rescheduled for September 29, 2005.

On September 27, 2005, Ms. Swenke sent a letter to Debtors denying a workout based on their non-compliance, failure to respond, and failure to provide requested information. Ex. 224.

### D.    Deed of trust foreclosure and trustee's sale

On September 29, 2005, Mark called Ms. Quarterman. He testified he had not yet received the September 27, 2005 denial letter, and also that he did not know a trustee's sale was scheduled for that day.[18] When advised of the pending sale, he asked to speak with the loss mitigation manager. That was Victoria Grimm.[19]

Mark testified that he was told by Ms. Grimm he could pay $22,000.00 to avoid foreclosure. He said he offered to make an electronic payment of

---

[18] Mark testified that had he known the sale was scheduled for that day, he would have refinanced the Property or become current on his payments. He said the reason he called that day was that September 29, 2005, was the date he had set in his mind for WaMu to complete a loan modification.

[19] Ms. Grimm has been a loss mitigation manager over Freddie Mac loans since 1997, and was Ms. Quarterman's supervisor.

MEMORANDUM OF DECISION - 10

$20,000.00 and to pay the $2,000.00 balance later that day.  However, he testified,

Ms. Grimm told him she could not reinstate Debtors' loan on that day.

Ms. Grimm testified she did not recall whether Mark offered to reinstate the

loan on September 29, 2005.  However, she said she did not tell Mark that he

could pay $22,000.00 to avoid foreclosure.  Her testimony was that on the date of a

scheduled sale, she does not know the exact reinstatement amount and therefore

cannot reinstate a defaulted loan.  Thus, she testified she could not have accepted

Mark's offer, if made.

Later that day, the deed of trust foreclosure and trustee's sale was

conducted by FATCO.  BARO was the successful bidder and purchased the

Property for $185,000.00.  FATCO granted BARO a trustee's deed that was

recorded that day.  Debtors, however, continued to reside at the Property without

BARO's permission.

### E.    Debtors' state court action, bankruptcy filing, and BARO's motion for stay relief

In October 2005, Debtors commenced a state court action against BARO,

WaMu and FATCO in the District Court for the Fourth Judicial District of the

State of Idaho in and for Ada County ("State Court") contesting the propriety of

the sale.  *See* Doc. No. 8 at attach.  At the same time, Debtors filed a *lis pendens*

against the Property.  BARO counterclaimed in State Court alleging that, as the

purchaser at the trustee's sale, it was entitled to possession of the Property.  *Id.*

MEMORANDUM OF DECISION - 11

BARO later sought a preliminary injunction requiring Debtors to pay monthly "rent" of $2,500.00 *pendente lite*.

On January 10, 2006, the State Court ordered that Debtors "pay to BARO $1,500.00 each month, due on the 10th day of the month, continuing until otherwise ordered by this Court." *Id*. at 28 (the "State Court Order").

On the eve of a summary judgment hearing in State Court, Debtors filed their bankruptcy petition on February 8, 2006. They claimed ownership of the Property in their schedules, notwithstanding the sale and deed to BARO, and alleged it had a fair market value of $650,000.00 with $313,518.72[20] of secured debt against it. Debtors also claimed as assets on schedule B potential litigation recoveries against BARO, WaMu, FATCO, US Bank and Key Bank.

The next day, BARO filed a motion for relief from the automatic stay to allow the State Court litigation to proceed. Doc. No. 8. In support of the motion, BARO attached the affidavit of Barb Malmstrom, filed by Debtors in State Court, that asserted $1,500.00 per month as the fair market rental value for the Property. Adv. Doc. No. 11 at attach.[21] Debtors objected to stay relief, Doc. No. 16, and filed this adversary proceeding.

---

[20] This amount represents: (1) WaMu's first deed of trust in the amount of $150,000.00; (2) US Bank's second position lien in the amount of $48,518.72; and (3) Key Bank's third position lien in the amount of $115,000.00. Doc. No. 25 at schedule D.

[21] Ms. Malmstrom has been a licensed real estate broker in Idaho since 1999. *Id*.

MEMORANDUM OF DECISION - 12

On April 24, 2006, this Court conditionally denied stay relief by incorporating the terms of the State Court Order requiring that Debtors pay BARO $1,500.00 per month.[22]  *See* Doc. Nos. 42, 43.

Shortly before trial, on August 6, 2008, BARO filed a renewed motion for stay relief based on Debtors' failure to make the $1,500.00 adequate protection payments.  Doc. No. 103.  Debtors objected to that motion, *see* Doc. No. 108, but never set a hearing as required by Local Bankruptcy Rule 4001.2.  No order continuing the stay in effect was ever entered.  *See* § 362(e).

**F.    Prior proceedings in this adversary proceeding**

An amended complaint was filed on October 2, 2006, alleging nine counts: (1) fraudulent conveyance under 11 U.S.C. § 548; (2) a claim against junior secured creditors KeyBank and US Bank; (3) reinstatement of liens; (4) default cure; (5) breach of contract; (6) breach of the covenant of good faith and fair dealing; (7) fraud; (8) violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 ("RESPA"); and (9) violations of the Idaho Consumer Protection Act, Idaho Code § 48-603(18) ("ICPA").  Adv. Doc. No. 38 (the "Amended Complaint").

The Amended Complaint was answered.  BARO also asserted a counterclaim against Debtors, contending they are tenants at sufferance under

---

[22] *See* § 361.

MEMORANDUM OF DECISION - 13

Idaho law.  Adv. Doc. No. 40.  BARO seeks under this counterclaim a judgment

for possession of the Property, a writ of ejectment, and a money judgment for the

reasonable rental value of the Property.  *Id*.

In October 2007, WaMu and BARO moved for summary judgement, and

Debtors filed a cross motion for summary judgment.  The Court, *inter alia*, granted

summary judgment to WaMu and BARO on the fraudulent transfer count.  Adv.

Doc. No. 116 at 19 ("Summary Judgment Decision").

**DISCUSSION AND DISPOSITION**

The issues tried were Debtors' causes of action for breach of contract,

breach of the covenant of good faith and fair dealing, and fraud, and BARO's

counterclaim.

### A.    Breach of contract

Debtors argue the SFP was a binding contract between them and WaMu.

They seek a money judgment of $400,000.00 for WaMu's alleged breach of that

contract.

Alternatively, Debtors argue that WaMu, the servicer of Debtors' mortgage

on the Property, had entered into a contract with Freddie Mac and that Debtors

may enforce that WaMu-Freddie Mac contract as a third-party beneficiary.

### 1.    Debtors failed to prove a distinct and common
### understanding with WaMu in executing the SFP

The burden of proof for showing the existence of a contract, and its breach,

MEMORANDUM OF DECISION - 14

is on the plaintiff. *O'Connor v. Harger Const. Inc*., 188 P.3d 846, 852 (Idaho 2008). Once the plaintiff has met that burden, the defendant has the burden of proving any affirmative defenses to enforcement of that contract. *Id*. Assuming a valid contract, a breach occurs when there is a failure to perform a contractual duty. *Shawver v. Huckleberry Estates, LLC*, 93 P.3d 685, 692 (Idaho 2004).

Formation of a contract requires a "meeting of the minds as evidenced by a manifestation of mutual intent to contract." *P.O. Ventures, Inc. v. Loucks Family Irrevocable Trust*, 159 P.3d 870, 875 (Idaho 2007). "In a dispute over contract formation it is incumbent upon the plaintiff to prove a distinct and common understanding between the parties." *Id*. The required distinct and common understanding may be express or implied. *McColm-Traska v. Valley View, Inc.*, 65 P.3d 519, 523 (Idaho 2003).

The Court finds that Debtors failed to prove a distinct and common understanding between them and WaMu in executing the SFP, or even cogently explain their own understanding of the terms of the alleged contract.

### a.    The allegedly promised "modification" or "new loan"

Debtors vacillated in defining the SFP's allegedly agreed upon terms. At trial, Mark first claimed that Ms. Quarterman promised Debtors a loan "modification" upon their completion of the plan payments. Ms. Quarterman, however, testified she did not make such a promise. She said that she offered

MEMORANDUM OF DECISION - 15

Debtors the SFP in order to give them ninety days to prove their ability to make timely monthly payments. While her system notes state that she advised Mark she would enter a ninety-day SFP "to be converted to a mod[ification]," they also indicate that she "explained the process." Ex. 118. As noted earlier, Ms. Quarterman's testimony was that this "process" involved a forbearance period followed by a *possible* modification. She testified that she had offered and explained a similar process to more than one hundred borrowers. Based on the conflicting testimony, the Court finds that Debtors failed to prove that WaMu agreed to modify Debtors' loan based solely upon their SFP payments.

Mark later testified that Ms. Quarterman promised Debtors a "new loan" under the terms of the SFP. However and importantly, Mark conceded that he and Ms. Quarterman never discussed any terms of a new loan. Also, Ms. Quarterman testified that she never promised Debtors a new loan, which would require underwriting, and that a new loan was not a possible loss mitigation activity under WaMu's policies.[23] Debtors therefore failed to prove a distinct and common understanding with WaMu with respect to these asserted contract terms.[24]

---

[23] Ms. Quarterman's testimony regarding the objectives of and options for loss mitigation activities echoed that of Ms. Grimm. Ms. Grimm explained that a specialist would never promise a new loan since the borrowers' income and ability to pay had not been verified. However, a forbearance plan followed by a loan modification was certainly possible. *See* Ex. 230 at Chapter 65.12. During a forbearance plan, borrowers have the opportunity to show regular income and payments. If they complete the plan payments, their loan may be considered for a modification based on current financial information.

[24] Not only did Debtors fail to prove a distinct and common understanding with respect
(continued...)

MEMORANDUM OF DECISION - 16

####    b.    The alleged promise to "consider" modification

In closing argument, Debtors' counsel advanced a third version of the alleged terms of the SFP.  Debtors' final argument, in essence, was that the SFP obligated them to make three payments[25] and to provide WaMu with two documents – a financial statement and a letter explaining their default – which Ms. Quarterman requested in her fax attached to the SFP.  In return, Debtors argue, WaMu agreed to "consider" these documents for a possible modification of their loan.  Debtors further contend that they performed under the SFP by making the required payments and sending Ms. Quarterman the requested documents on June 7, 2005 (the "June 2005 Fax").[26]  Thus, in their view, WaMu breached the agreement based on Ms. Quarterman's failure to "consider" that information.

Ms. Quarterman consistently testified that she never agreed to consider a loan modification based solely on the documents in the June 2005 Fax.  Like her repudiation of Debtors' claim that she promised a modification if they made all plan payments, Ms. Quarterman's testimony was that she told Mark the SFP

---

[24](...continued)
to Mark's two versions of the alleged terms of the SFP, the credibility of and the weight to be given his testimony was an issue.  As noted, Mark's testimony regarding Ms. Quarterman's alleged promise was inconsistent, and his ability to document and recall his conversations with her was questionable.

[25]  These were $2,000.00 by June 6, 2005, $1,500.00 by July 6, 2005, and $1,500.00 by August 6, 2005.  *See* Ex. 111.

[26]  This included a June 6, 2005 financial statement, a letter from Mark, and Jan's paystub for the period ending December 31, 2004.  *See* Exs. 112, 114-16.

MEMORANDUM OF DECISION - 17

involved a forbearance period and a possible modification, dependent upon *current* financial information. She also said that she told Mark she did not need Debtors' financial information until August 2005. Thus, to the extent WaMu agreed to "consider" a modification, that obligation was conditional on information current as of August 2005, and such information was never provided.

Also, in determining whether Debtors proved that WaMu agreed to "consider" a modification based on the June 2005 Fax, the Court looks to Debtors' understanding with WaMu under the First Forbearance Plan, which Mark acknowledged required the submission of several financial documents. *See* note 8 *supra*. In light of the information required for that plan, Debtors did not prove that WaMu agreed under the SFP to consider a modification based on fewer and less current items, such as those provided with the June 2005 Fax.[27] Moreover, the fact that Mark included Jan's paystub in that fax even though Ms. Quarterman had not requested it under the SFP suggests that Debtors understood that WaMu needed additional financial information, and not just a financial statement and a letter, in order to consider a loan modification.

Additionally, the Court notes that Debtors advanced starkly disparate arguments regarding WaMu's alleged obligation under the SFP to consider their

---

[27] For example, Jan's paystub was for the period ending December 31, 2004. However, it was established at trial that at the time of the June 2005 Fax, Jan could have obtained a current paystub from the human resources department or on-line. She did not do this because, Mark testified, her pay had not changed. However rational Mark thought that reasoning, he never proved WaMu agreed to forgo current financial information based on it.

MEMORANDUM OF DECISION - 18

financial information.  Throughout the summary judgment process and in their pretrial briefing, Debtors argued the June 2005 Fax gave Ms. Quarterman all of the information she said she needed to consider a loan modification.  This, Debtors insisted, was the reason they did not provide any further or more current information in response to her August 2005 letters.[28]  At trial, however, the argument changed, with Mark testifying that he did not provide the current information because he never received the August 2005 letters.

Based on all of the above findings, the Court concludes that Debtors failed to prove that WaMu agreed to consider a modification of their loan based solely on the documents in the June 2005 Fax.

Having considered each of the various versions of an alleged contract, the Court concludes that Debtors did not carry their burden and establish that there was a meeting of the minds, or a distinct and common understanding, either express or implied, between WaMu and Debtors.  Absent a valid contract, there can be no action for breach of that contract nor an award of contact damages.

### 2.    Debtors failed to establish their third-party beneficiary claim

The Idaho Supreme Court recently addressed the elements of a third-party

---

[28] *See* Plaintiffs' Opposition to WaMu's Statement of Asserted Undisputed Facts, and Statement of Asserted Undisputed Facts, Adv. Doc. No. 91 at 8, ¶ 45-47; Plaintiffs' Mem. in Opposition to WaMu's Mot. for Summary Judgment, and in Support of Plaintiffs' Mot. for Summary Judgment, Adv. Doc. No. 92 at 8-10; Plaintiffs' Reply Mem. in Support of Mot. for Summary Judgment and in Opposition to WaMu's Mot. for Summary Judgment, Adv. Doc. No. 105 at 11; Plaintiffs' Pretrial Mem., Adv. Doc. No. 130 at 6-8.

MEMORANDUM OF DECISION - 19

beneficiary claim, stating:

> When a contract is made expressly for the benefit of a third person, the contract may be enforced by the third person at any time before the parties to the contract rescind it. *Blickenstaff v. Clegg,* 140 Idaho 572, 579, 97 P.3d 439, 446 (2004); I.C. § 29-102. "The test for determining a party's status as a third-party beneficiary . . . is whether the agreement reflects an intent to benefit the third party." *Idaho Power Co. v. Hulet*, 140 Idaho 110, 112, 90 P.3d 335, 337 (2004). The third party must show the contract was made primarily for his benefit; it is not sufficient that the third party is a mere incidental beneficiary to the contract. *Id*. (quoting *Adkison Corp. v. Am. Bldg. Co.*, 107 Idaho 406, 409, 690 P.2d 341, 344 (1984); *Fenwick v. Idaho Dep't of Lands,* 144 Idaho 318, 323, 160 P.3d 757, 762 (2007) (quoting *Dawson v. Eldredge*, 84 Idaho 331, 337, 372 P.2d 414, 418 (1962) (quoting *Sachs v. Ohio Nat'l Life Ins. Co.*, 148 F.2d 128, 131 (7th Cir.1945))). The intent to benefit the third party must be expressed in the contract itself. *Idaho Power Co.*, 140 Idaho at 112, 90 P.3d at 337 (quoting *Adkison Corp.*, 107 Idaho at 409, 690 P.2d at 344;) *Fenwick,* 144 Idaho at 323, 160 P.3d at 762 (quoting *Adkison Corp.*, 107 Idaho at 409, 690 P.2d at 344).

*Partout v. Harper*, 183 P.3d 771, 775 (Idaho 2008).

In *Partout*, a buyer purchased a home with a loan guaranteed by the U.S. Department of Veterans Affairs ("VA"). *Id*. at 773. As part of its guarantee, the VA retained an appraiser to perform an appraisal of the property. The home buyer later discovered foundation problems with the property and sued several people, including the appraiser. Relying on portions of the VA Lender's Handbook and the Uniform Standards of Professional Appraisal Practice, the home buyer argued he was a third-party beneficiary to the contract between the VA and the appraiser. The court rejected the argument, finding that the home buyer failed to show a contract between the VA and the appraiser which expressed an intent primarily to

MEMORANDUM OF DECISION - 20

benefit him.  *Id*. at 775.

Here, Debtors point to the Freddie Mac Single-Family Seller/Servicer

Guide (the "Guide")[29] to support their third-party beneficiary claim.  They argue

the Guide is a contract between WaMu and Freddie Mac and, additionally, that the

provisions requiring a "Servicer" to assist a "Borrower" by taking loss mitigation

actions reflect an intent that the contact was for Debtors' benefit.[30]  For example,

the Guide requires that the Servicer analyze the Borrower's financial situation and

pursue alternatives to foreclosure if the Borrower cannot reinstate.  *See* Guide at

Chapter 65.6; *see also* Chapter A65 (addressing reinstatements and relief options);

Chapter B65 (governing workout options).  WaMu admitted at trial that it serviced

Debtors' mortgage of the Property here at issue, and that, in its relations with

Freddie Mac, it was bound by the Guide's terms.

To prevail on their claim, Debtors were required to prove not just a contract

between WaMu and Freddie Mac, but that such contract expressly shows an intent

primarily to benefit them.  Debtors failed to prove that the Guide comprises part of

a contract, or that contract's terms.  More importantly, even if Debtors established

---

[29]  *See* Single-Family Seller/Servicer Guide, *at*  http://freddiemac.com/singlefamily/#
(1989).

[30]  "Servicer" as used in the Guide is "a Seller/Servicer acting in its capacity as a servicer
of Mortgages for Freddie Mac."  *Id*. at Glossary.  A "Seller/Servicer" is an institution approved to
sell mortgages to Freddie Mac; or service mortgages purchased by Freddie Mac; or sell
mortgages to and service mortgages purchased by FreddieMac.  *Id*.  A "Borrower" is "the party
obligated to repay the indebtedness secured by the Mortgaged Premises."  *Id*.

MEMORANDUM OF DECISION - 21

the existence of a contract between WaMu and Freddie Mac which included or incorporated the Guide, they did not prove such contract was intended primarily for their benefit or that this intent was manifested expressly in that contract. Under Idaho law, "the intent to benefit the third party must be expressed in the contract itself." *Partout*, 183 P.3d at 775. Thus, while Debtors might have incidentally benefitted from the Guide's loss mitigation provisions, they failed to establish the essential elements of their third-party beneficiary claim. *Id.*

The Court concludes Debtors' third-party beneficiary claim fails. Count five will be dismissed.

### B.    Breach of the covenant of good faith and fair dealing

Debtors allege that WaMu breached the covenant of good faith and fair dealing by failing to perform its obligations under the SFP.

In every contract there is an implied duty of good faith and fair dealing. *Idaho First Nat'l Bank v. Bliss Valley Foods*, 824 P.2d 841, 863 (Idaho 1991). The implied covenant of good faith and fair dealings "requires that the parties perform, in good faith, the obligations imposed *by their agreement*." *Lettunich v. Key Bank Nat'l Ass'n*, 109 P.3d 1104, 1109 (Idaho 2005) (emphasis added). The covenant therefore "arises only regarding terms agreed to by the parties." *Id.* Moreover, the covenant is violated only when a party "violates, nullifies or significantly impairs any benefit of the . . . contract." *Bliss Valley Foods*, 824 P.2d at 864 (citation omitted).

MEMORANDUM OF DECISION - 22

The *sine qua non* of this cause is the existence of a proven contact between Debtors and WaMu.  Having determined that Debtors failed to establish the formation of a contact, the Court finds and concludes there could be no breach of a covenant attendant to such a contract.  Count six will be dismissed.

### C.    Fraud

Debtors' fraud claim has throughout this action been based on Ms. Quarterman's alleged statement to Mark that the June 9, 2005 scheduled trustee's sale was "stopped."  They argue her failure to explain that the sale was only temporarily "postponed" was fraudulent.

However and additionally, Debtors alleged for the first time in closing argument that the fraud count was based on Ms. Grimm's alleged statement to Mark on September 29, 2005, that she could not reinstate Debtors' loan on that day.

To successfully prove fraud under Idaho law, a plaintiff must establish nine elements: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.  *Partout*, 183 P.3d at 776.  Fraudulent intent may be established by circumstantial evidence. *See Nerco Minerals Co. v. Morrison Knudsen Corp.*, 90 P.3d 894, 901 (Idaho 2004); *DBSI/TRI v. Bender*, 948 P.2d 151, 162 (Idaho 1997).

MEMORANDUM OF DECISION - 23

The plaintiff alleging fraud must prove each of the elements by clear and convincing evidence. *Country Cove Dev., Inc. v. May*, 150 P.3d 288, 293 (Idaho 2006). The failure to prove any one element of fraud is fatal to recovery. *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 386 (Idaho 2005).

### 1.    Ms. Quarterman's alleged fraud

Mark's testimony is that in discussing the SFP, Ms. Quarterman said the scheduled June 9, 2005 trustee's sale was "stopped," and that her conveyed message (and not just his interpretation) was that the sale was permanently stopped or cancelled.

The first problem with Debtors' theory is that there is no preponderating, much less clear and convincing, evidence that the statement ("stopped") was in fact made. Ms. Quarterman testified that she never said the trustee's sale was "stopped." She said that under the Guide, once the foreclosure process is initiated, a scheduled sale may only be "postponed." This is what she said she told Mark. Absent adequate proof that Ms. Quarterman made the alleged statement, Debtors' cause of action for fraud is not actionable.

Further, even if the term "stopped" was used, the word's meaning is equivocal. The evidence is in conflict whether the sense of the word, by context or otherwise, was that of a complete cancellation or termination of the sale rather than a postponement of the sale. Mark testified that Ms. Quarterman never explained the meaning of the word. Therefore, Mark's connotation could as easily

MEMORANDUM OF DECISION - 24

be his own gloss as a knowingly false statement by Ms. Quarterman.

Additionally, Ms. Quarterman testified that if she said "stopped," she would have been referring only to stopping the sale scheduled on a specific date, not stopping the foreclosure process.[31]  It is undisputed that the trustee's sale did not occur as scheduled on June 9, 2005, and was postponed four times prior to the sale to BARO in September 2005.  Thus, in this sense, if the statement was made, there is no clear and convincing evidence that it was false.

There is also nothing at all in the evidence that Ms. Quarterman knowingly made a false statement with the intent to deceive the Debtors.  Mark explicitly testified that Ms. Quarterman never deceived him.  He further testified that he and Ms. Quarterman "had the same goal," and that it was Ms. Quarterman's intent to help Debtors avoid foreclosure and sale of the Property.  The entirety of the evidence, including Ms. Quarterman's continued efforts to assist Debtors with a forbearance plan, belie the idea that she intended to mislead them with a knowingly false representation.

The Court has thus found that Debtors did not prove several of the nine fraud elements as to Ms. Quarterman.  The failure to prove any one element is fatal to their fraud claim.  *Jenkins*, 108 P.3d at 386.[32]  The Court concludes count

---

[31]  Ms. Grimm also testified that during a forbearance period, a scheduled sale may only be "postponed."  It may not be permanently "stopped" or "cancelled."

[32]  While the other elements need not be discussed, the Court notes that Debtors failed to
(continued...)

MEMORANDUM OF DECISION - 25

seven will be dismissed as to Ms. Quarterman's alleged fraud.

### 2.    Ms. Grimm's alleged fraud

Mark's testimony was that when talking with Ms. Grimm on September 29, 2005, she told him she could not reinstate Debtors' loan on that date.  This alleged statement forms the basis of Debtors' fraud claim as to Ms. Grimm.

Ms. Grimm testified she could not recall whether she told Mark on September 29, 2005, that she could not reinstate Debtors' loan that day.  However, she did recall telling him something to the effect that "there was nothing she could do to help him" at that time.  The evidence therefore is in conflict whether Ms. Grimm actually made the alleged statement.

Even assuming Ms. Grimm told Mark she could not reinstate Debtors' loan on September 29, 2005, there is not clear and convincing evidence that the statement was false, or that Ms. Grimm knew it to be false.  Ms. Grimm testified it was her understanding that on the date of a trustee's sale, WaMu does not know the reinstatement amount and therefore cannot reinstate a defaulted loan.  If borrowers make such a request, she said she would have to refer them to the title company conducting the sale to obtain the exact reinstatement amount, including fees incurred.  The borrowers would then pay the title company the reinstatement amount.  Thus, Ms. Grimm's testimony was that if Mark asked her on September

---

[32](...continued)
present evidence as to their justifiable reliance.

MEMORANDUM OF DECISION - 26

29, 2005, to reinstate Debtors' loan, she could not have done so.[33]

And, as with Ms. Quarterman, the evidence also does not support the idea that Ms. Grimm made a false statement to Mark with the intent to deceive Debtors. To the contrary, Ms. Grimm's testimony was that the goal of loss mitigation is to assist borrowers in default to avoid foreclosure. She further testified it is in WaMu's financial interest to keep loans active in order to collect principal and interest, and that WaMu receives a financial incentive from Freddie Mac to enter workouts for defaulted loans. Considering Ms. Grimm's testimony, and Debtors' failure to prove any fraudulent intent on her part, the Court finds that Debtors did not prove another required element of their fraud claim.

Based on the forgoing, Debtors failed to prove several of the required elements of their fraud claim as to Ms. Grimm. Not only is there a dispute over whether Ms. Grimm knowingly made a false statement, Debtors did not prove she made a statement with the intent to deceive them. Debtors therefore failed to carry their burden of proving each element of fraud by clear and convincing evidence, and the Court need not consider the remaining elements. Count seven based on

---

[33] In support of their argument, Debtors point to Mark's February 2, 2004 request to WaMu for the reinstatement amount. *See* Ex. 204. WaMu responded that same day with a letter stating the full reinstatement amount through the end of that month. *See* Ex. 129. Debtors offered the letter as evidence that Ms. Grimm could have, but fraudulently refused to, reinstate their loan pursuant to Mark's request. However, it is not clear with whom Mark made his request, and which department at WaMu obtained the reinstatement amount and generated the letter. The mere fact that another WaMu employee provided Debtors with the reinstatement amount at a prior date is not clear and convincing evidence that Ms. Grimm knowingly made a false statement to Mark.

MEMORANDUM OF DECISION - 27

Ms. Grimm's alleged fraud will be dismissed.

### D.    Debtors' other counts

Debtors' counts two (claim against junior secured creditors KeyBank and

US Bank), three (reinstatement of liens of KeyBank and US Bank) and four

(default cure) of the Amended Complaint were neither addressed in the pretrial

briefing nor argued at trial.  Based on the state of the record, the Court concludes

that counts two, three and four of the Amended Complaint will be dismissed.

### E.    BARO's motion for stay relief, and counterclaim for possession and damages

BARO seeks related relief in its motions for stay relief in the chapter 11

case and the counterclaim for possession in this adversary proceeding.  The

renewed motion for stay relief, filed on August 6, 2008, is premised on Debtors'

alleged failure to make the required $1,500.00 monthly adequate protection

payments.  *See* Doc. No. 103 ("Renewed Motion").[34]  In the counterclaim, BARO

argues that Debtors are tenants at sufferance under the Idaho Code.[35]  *See* Adv.

---

[34]  As noted earlier, the Court denied BARO's first motion for stay relief, Doc. No. 8, on the condition that Debtors make $1,500.00 monthly adequate protection payments.  *See* Doc. Nos. 42, 43.  That decision stated that "Debtors' failure to make such payments will entitle BARO to return to this Court upon shortened notice to renew its request for termination of the stay."  Doc. No. 42 at 13.  It also noted: "The Court will allow the matter to come on for hearing on ten (10) days notice, and will allow BARO to schedule such hearing notwithstanding the usual operation of LBR 4001.2."  *Id.*, n.11.  For context, the Renewed Motion was filed about ten days prior to trial in this adversary proceeding.

[35]  Idaho Code § 45-1506(11) states that "the purchaser at the trustee's sale shall be entitled to possession of the property on the tenth day following the sale, and any persons remaining in possession thereafter under any interest except one prior to the deed of trust shall be
(continued...)

MEMORANDUM OF DECISION - 28

Doc. No. 40.  BARO seeks a judgment for possession and a writ of ejectment to remove Debtors from the Property.  BARO's counterclaim also requests an award of damages in an amount "not less than $2,500.00 per month."  *Id*. at 6.[36]

In closing argument, Debtors conceded that based on the Summary Judgment Decision, BARO owned the Property.  However, Debtors argue the $1,500.00 monthly payments ordered by the State Court, and incorporated in this Court's conditional denial of stay relief, established the reasonable rental value of the Property, and they contested the damages asserted by BARO.

### 1.      Relief from the stay is granted

#### a.      Debtors' interest in the Property terminated pre-petition

The Court first considers whether Debtors had an interest in the Property under Idaho law at the time they filed the bankruptcy petition.[37]  Idaho Code § 45-1508 states that "a sale made by a trustee under this act *shall foreclose and terminate all interest in the property covered by the trust deed of all persons to whom notice is given* under section 45-1506, Idaho Code."  Idaho Code § 45-1508

---

[35](...continued)
deemed to be tenants at sufferance."

[36]  Debtors filed no response to the counterclaim.

[37]  Section 541(a)(1) of the Code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case."  *See United States v. Whiting Pools, Inc*., 462 U.S. 198, 204-05 (1983).  While defining property of the estate is a matter of federal law, the nature and extent of a debtor's interest in property is determined by state law.  *See Butner v. United States*, 440 U.S. 48, 55 (1979); *Foothill Capital Corp. v. Clare's Food Mkt., Inc. (In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1099 (9th Cir. 1997).

MEMORANDUM OF DECISION - 29

(emphasis added).

In interpreting this statute in the context of a motion for stay relief, this Court in *In re Wiebe*, 353 B.R. 906, 06.4 I.B.C.R. 98 (Bankr. D. Idaho 2006) ("*Wiebe I*"), granted the motion, concluding that the debtors' interest in the property terminated upon the pre-petition trustee's sale of that property.  353 B.R. at 912, 06.4 I.B.C.R. at 100.  The debtors therefore had no interest in the property as of the petition date, and the property was not property of the estate protected by the automatic stay.  *Id*.

The Property at issue here was sold at a trustee's sale conducted in September 2005, and this Court previously determined that the deed of trust foreclosure and sale complied with the applicable Idaho statutes, and that such sale would not be avoided as a fraudulent transfer.  Thus, Debtors had no interest in the Property when they filed their chapter 11 petition in February 2006.[38]  *Wiebe I*, 353 B.R. at 912.

### b.      The stay automatically terminated under § 362(e)

Even if Debtors had an interest in the Property which was protected under § 362(a), the stay automatically terminated with respect to BARO.

BARO requested stay relief pursuant to § 362(d)(1).  In referring to this

---

[38] If Debtors had a "possessory" right notwithstanding the sale, it lasted only ten days. *See* Idaho Code § 45-1506(11) cited *supra* note 35.

MEMORANDUM OF DECISION - 30

section, § 362(e) states:

> Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section.

*See also In re Hall*, 04.3 I.B.C.R. 96 (Bankr. D. Idaho 2004) (enforcing § 362(e));

*In re Kirkendall*, 00.3 I.B.C.R. 125, 126 (Bankr. D. Idaho 2000) (same); *In re Wahobin*, 98.4 I.B.C.R. 97 (Bankr. D. Idaho 1998) (same).

Local Bankruptcy Rule 4001.2 recognizes the existence and operation of § 362(e) of the Code. For example, a movant for § 362(d) relief as to property of the estate must provide, in this District, a special notice regarding § 362(e). LBR 4001.2(g).[39] Further, pursuant to Local Rule 4001.2(e)(1), the party objecting to a motion for stay relief must schedule the hearing required under § 362(e).[40] In explaining this burden, this Court has stated:

> [T]he opposing party must not only file an objection within 17 days of the motion in order to prevent entry of an order as "unopposed" under

---

[39] Local Rule 4001.2(g) states: "In any motion filed under this rule, the movant shall include a notice of the requirements of subdivision (c), (d)(3), and (e)(1), of this rule. In addition, if relief is sought from the automatic stay against acts against property of the estate under § 362(d) and (e), the notice shall also advise the party against whom relief is sought of the requirements of § 362(e)." LBR 4001.2.

[40] Local Rule 4001.2(e)(1) states: "A party opposing a motion shall contact the court's calendar clerk to schedule a preliminary hearing. The objection to a motion shall include the notice of such hearing." LBR 4001.2(e)(1).

MEMORANDUM OF DECISION - 31

> LBR 4001.2(c), the opposing party must *also* schedule a preliminary
> hearing within 30 days and issue notice of that hearing simultaneously
> with the objection in order to prevent the motion from being
> automatically effective pursuant to § 362(e).

*In re Hall*, 04.3 I.B.C.R. at 97. *See also* LBR 4001.2 at Advisory Committee

Notes to 2004 revisions (stating that "[a]n objection without a properly noticed and

timely conducted hearing will be ineffective to prevent automatic relief under

§ 362(e).").

Here, Debtors timely filed an objection, *see* Doc. No. 108, but did not

schedule the necessary hearing within thirty-three days of service of the Renewed

Motion. Thus, Debtors did not meet their burden under the Code, the Rules, and

the Local Rules, in opposing the Renewed Motion. Under the terms of § 362(e),

the stay was automatically terminated on September 9, 2008.

Based on the foregoing, the Court concludes Debtors had no interest in the

Property at the time of the petition, and even if they did, the stay automatically

terminated by operation of § 362(e). The Court concludes the Renewed Motion

will be granted.

### 2. BARO is entitled to possession of the Property, but the Court will not issue the requested writ

The Court also finds that BARO is entitled to possession of the Property.

As previously discussed, Debtors' interest in the Property terminated upon the

MEMORANDUM OF DECISION - 32

trustee's sale to BARO.  However, Debtors remained in possession of the Property pending litigation before this Court and the State Court.  Since all of Debtors' claims in the adversary proceeding have now been resolved against Debtors and in favor of WaMu and BARO, the Court will enter a judgment on the counterclaim granting possession to BARO.

Enforcement of that judgment is another matter.  The Court's decision in *In re Wiebe*, No. 06-40325, 2007 WL 78983 (Bankr. D. Idaho Jan. 3, 2007) ("*Wiebe II*"), suggests that BARO's request for a writ of ejectment should be denied.  Based on the holding in *Wiebe I* that the trustee's sale terminated the debtors' interest in the property, the Court in *Wiebe II* refused to issue a writ evicting the debtors from that property.  2007 WL 78983, at *2 (holding that the issuance of such writ was not necessary under § 105(a) since the property was not property of the estate).  The same reasoning applies here.

Moreover, a writ from this Court is not essential.  Since BARO's judgment will confirm its right to possession of the Property, and since stay relief is granted, BARO may seek enforcement of its rights and possession of the Property in state court should Debtors not relinquish possession.

### 3.    BARO is also entitled to money damages

An owner wrongfully deprived possession of his real property is entitled to the reasonable rental value of the property during the time it is withheld.  *See*

MEMORANDUM OF DECISION - 33

*Knight v. Fox Caldwell Theatres Corp.*, 212 P.2d 1027, 1029 (Idaho 1950);

*Krepcik v. Tippett*, 710 P.2d 606, 611 (Idaho Ct. App. 1985).[41]  However, in

Idaho, damages must be proven with reasonable certainty.  *Bumgarner v.*

*Bumgarner*, 862 P.2d 321, 332 (Idaho Ct. App. 1993).  In other words, an award

of economic damages must be based on proof, not speculation or conjecture.  *See*

*Cole v. Esquibel*, 182 P.3d 709, 711 (Idaho 2008) (citing *Horner v. Sani-Top, Inc.*,

141 P.3d 1099, 1106 (Idaho 2006)).

As noted, BARO's counterclaim seeks an award of damages in an amount

"not less than $2,500.00 per month."  At trial, BARO requested $4,100.00 per

month for its loss of use of the Property.  BARO intended this amount to include

its other alleged damages, including (i) a $2,100.00 monthly "carrying cost" to

service the debt and pay taxes and insurance on the Property, (ii) the inability to

occupy the Property as a principal residence for two years beginning in 2005, and

to sell it in 2007 without realizing capital gains tax, and (iii) the higher interest rate

on BARO's loan on the Property resulting from Debtors' alleged refusal to allow

an appraiser inside the Property.

The $4,100.00 amount is based on what BARO calls a gross rent multiplier

("GRM").  BARO's witness, Cameron Baldwin, and Debtors' witness, Timothy

---

[41] *See also* 52B C.J.S. Landlord & Tenant § 1363 (2008); Restatement (Second) of
Property, Landlord & Tenant § 14.5 (1977); C.S. Patrinelis, *Measure of damages for tenant's
failure to surrender possession of rented premises*, 32 A.L.R.2d 582 (1953).

MEMORANDUM OF DECISION - 34

Sullivan, who are licensed appraisers in Idaho, testified to their understanding of a GRM. Their testimony established that a GRM analysis may be used to estimate a property's gross monthly rental income by dividing the value of a property by a multiplier. By claiming damages of $4,100.00 per month, BARO therefore used a Property value of $450,000.00 on September 29, 2005, and a multiplier of 110.[42]

The first problem with BARO's reliance on a GRM analysis to estimate its damages is that the values used to estimate the Property's rental income are not supported by the evidence. The witnesses disputed both the value of the Property on September 29, 2005, and whether 110 was an accurate multiplier.

Even assuming these values were appropriate, neither the GRM methodology nor the alleged amount of rental thereunder is supported by evidence adequate to take the claimed damages of $4,100.00 per month out of the range of speculation. The testimony of Mr. Baldwin and Mr. Sullivan was identical and persuasive in establishing that the highest and best use of the Property is an "owner-occupied residence" and, further, that any rental income that could be derived from the Property could not support its true value. Moreover, their testimony also established that the GRM does not always yield an accurate

---

[42] BARO requested $143,500.00 in damages at the time of trial. This amount represents gross monthly income of $4,090.91 ($450,000.00 divided by 110), rounded to $4,100.00, and multiplied by thirty-five months (September 2005 through August 2008). This asserted damage would, of course, need to be reduced by those $1,500.00 monthly payments that were actually made.

MEMORANDUM OF DECISION - 35

estimate of monthly rental income.[43]  Thus, the witnesses agreed a GRM analysis

was only a broad indicator of value *and* inappropriate for this Property.

Additionally, BARO did not prove that the $4,100.00 monthly rental

income figure derived from a GRM analysis was an appropriate amount of its

damages.  Mr. Baldwin, BARO's own witness, unequivocally testified that the

rental market for the Property simply could not bear $4,100.00 per month.  In his

opinion, the maximum rental income of the Property was $1,500.00 per month.

Considering this testimony together with the balance of the evidence, BARO's

alleged damages of $4,100.00 per month was not proved with reasonable

certainty.

BARO nonetheless is entitled to any non-speculative damages proven at

trial.  Because BARO failed to prove its damages based on a GRM analysis, the

only other evidence offered at trial as to the Property's reasonable rental value was

Mr. Baldwin's testimony that $1,500.00 was the maximum monthly rental income.

This was the same amount the State Court ordered Debtors pay BARO for their

occupancy of the Property, and that this Court ordered as adequate protection

payments.  There is no evidence that BARO objected to this amount under the

prior orders.

---

[43]  Mr. Sullivan said he therefore conducted the Property appraisals using a cost approach
and a sales comparison analysis rather than the income approach, such as a GRM analysis.

MEMORANDUM OF DECISION - 36

The Court therefore concludes BARO is entitled to damages of $1,500.00 per month for its loss of use of the Property. This amount is for the period beginning on October 9, 2005[44] until the date Debtors vacate the Property and surrender possession to BARO. All other claims for damages, including payment of a higher interest rate and an inability to sell the Property without realizing capital gains tax, were not supported by evidence sufficient to take those alleged damages out of the realm of speculation.

However, because it is not clear to the Court whether Debtors have made all of the $1,500.00 adequate protection payments, BARO must establish the total amount of damages by accounting for the payments actually received and determining the date on which Debtors relinquish possession of the Property. The Court will consider entry of a money judgment upon BARO's post-trial submissions establishing this amount, and hearing on notice to Debtors, unless BARO and Debtors agree and submit an endorsed form of judgment.

### F.    Attorneys fees and costs

WaMu requests its fees and costs in defending this adversary proceeding pursuant to contract and Idaho Code § § 12-120 and 12-121. *See* Adv. Doc. No. 30. BARO also requests "costs, disbursement, and attorney fees." *See* Adv. Doc.

---

[44] Based on the Summary Judgment Decision that Debtors failed to prove the September 29, 2005 trustee's sale did not comply with Idaho Code Title 45, Chapter 15, Debtors were tenants at sufferance effective October 9, 2005 under Idaho Code § 45-1506(11). *See supra* note 35.

MEMORANDUM OF DECISION - 37

No. 40.[45]

WaMu and BARO must establish their entitlement to an award of attorney fees and costs. *See Centre Ins. Co. v. SNTL Corp. (In re SNTL)*, 380 B.R. 204, 223 (9th Cir. BAP 2007) (remanding and instructing the bankruptcy court to evaluate a determination of entitlement to fees "under the relevant contracts *or state law*") (emphasis added); *see also Hopkins v. Saratoga Holdings, LLC (In re Colvin)*, 08.2 I.B.C.R. 63, 2008 WL 1957855 (Bankr. D. Idaho 2008) (awarding fees under Idaho law in an adversary proceeding for alleged breach of contract).[46] They must also establish the amounts recoverable. As the parties acknowledged at trial, there are no affidavits, itemization of fees and costs, or any other evidence for the Court to evaluate amounts that might be claimed or their reasonableness. The Court therefore will consider the matter upon submission of post-trial affidavits as to the fees and costs claimed, and post-trial briefing of authorities supporting an award.[47]

---

[45] In its pretrial briefing, BARO also seeks attorney fees under Idaho Code § 6-324 as the prevailing party in an unlawful detainer action under Idaho Code Title 6, Chapter 3. Since the Court grants no relief to BARO on this theory, fees will not be awarded under this section.

[46] *See also Kilborn v. Haun (In re Haun)*, No. 07-00633-TLM, 2008 WL 4411335 (Bankr. D. Idaho Sept. 25, 2008) (addressing Idaho fee provisions).

[47] WaMu and BARO shall file affidavits and supporting briefs no later than fifteen days after the date of this Decision. Debtors shall file a reply brief within fifteen days thereafter. Whether there is a hearing on the matter is solely in the Court's discretion.

MEMORANDUM OF DECISION - 38

**CONCLUSION**

Based on the foregoing, the Court finds, concludes and holds:

1.      Debtors' counts two (claim against junior secured creditors KeyBank and

US Bank), three (reinstatement of liens of KeyBank and US Bank), four

(default cure), five (breach of contract), six (breach of the covenant of good

faith and fair dealing) and seven (fraud) in the Amended Complaint, Adv.

Doc. No. 38, will be dismissed.  All other counts were dismissed in the

Summary Judgment Decision.  WaMu shall submit an appropriate form of

judgment as to dismissal of all counts of Plaintiffs' Amended Complaint

under this Decision and the Summary Judgment Decision.

2.      BARO's motion for stay relief, Doc. No. 103, will be granted.  BARO shall

submit an appropriate form of order.

3.      BARO's counterclaim for possession, Adv. Doc. No. 40, will be granted in

part and denied in part.  BARO is entitled to a judgment establishing its

ownership of and right to possession of the Property.  However, the Court

will not issue a writ of ejectment.  BARO shall submit an appropriate form

of order.

4.      BARO is entitled to damages in the amount of $1,500.00 per month

commencing on October 9, 2005, until Debtors vacate the Property and

surrender possession to BARO.  The Court will later enter a money

MEMORANDUM OF DECISION - 39

judgment in favor of BARO upon BARO's submissions establishing the

total amount of damages, consistent with this Decision.

5.      The Court will consider an award of attorneys fees and costs to WaMu and

BARO upon submissions by the parties.

DATED: November 6, 2008



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 40